**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF ALABAMA<br>Alabama State Capitol<br>600 Dexter Avenue, Suite NB-05<br>Montgomery, Alabama 36130-3024,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. ARMY CORPS OF ENGINEERS<br>441 G Street NW<br>Washington, DC 20314-1000;<br><br>ROBERT M. SPEER,<br>in his official capacity as<br>Acting Secretary of U.S. Army,<br>101 Army Pentagon<br>Washington, DC 20310-0101;<br><br>DOUGLAS LAMONT,<br>in his official capacity as senior official<br>exercising the functions of the Assistant<br>Secretary of U.S. Army for Civil Works,<br>108 Army Pentagon<br>Washington, DC 20310-0108;<br><br>TODD T. SEMONITE,<br>in his official capacity as<br>Commander and Chief of Engineers for U.S.<br>Army Corps of Engineers,<br>U.S. Army Corps of Engineers<br>441 G Street NW<br>Washington, DC 20314-1000<br><br>C. DAVID TURNER,<br>in his official capacity as<br>Division Commander for<br>South Atlantic Division of<br>U.S. Army Corps of Engineers,<br>U.S. Army Corps of Engineers<br>South Atlantic Division<br>60 Forsyth Street SW, Room 10M15<br>Atlanta, Georgia 30303-8801; | **CIVIL ACTION NO. 1:17-cv-00607** |

JAMES A. DELAPP,
in his official capacity as
District Commander for Mobile District of
U.S. Army Corps of Engineers,
U.S. Army Corps of Engineers
Mobile District
P.O. Box 2288
Mobile, Alabama 36628-0001,

Defendants.

## COMPLAINT OF STATE OF ALABAMA

The State of Alabama brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, and the Water Supply Act of 1958, 43 U.S.C. §§ 390b *et seq.*, to set aside the U.S. Army Corps of Engineers' adoption in 2017 of the Final Environmental Impact Statement ("FEIS") for the Apalachicola-Chattahoochee-Flint ("ACF") River Basin Water Control Manual ("WCM") and Water Supply Storage Assessment ("WSSA").

## PARTIES

1. Plaintiff State of Alabama ("Alabama") is a sovereign State of the United States. Alabama Governor Robert Bentley has authorized the undersigned attorneys under Section 36-13-2 of the *Alabama Code* to bring this action.

2. Defendant United States Army Corps of Engineers ("Corps") is an agency of the United States. The Corps' headquarters are in Washington, D.C. The Corps' functions include implementing manuals for its operations in the ACF River Basin and allocating storage for water supply from its projects in the ACF.

3. Defendant Robert M. Speer, Acting Secretary of the United States Army ("Secretary"), is the official who directs and supervises the Corps. The Secretary maintains an office in Washington, D.C. Alabama brings this action against the Secretary in his official capacity only.

4. Defendant Douglas W. Lamont, purporting to perform duties of the Assistant Secretary of the Army for Civil Works ("Assistant Secretary") is the official responsible for taking certain actions that are the subject of this complaint. The Assistant Secretary maintains an office in Washington, D.C. Deputy Assistant Secretary Lamont purported to exercise the function of the Assistant Secretary in signing the Record of Decision for the FEIS, WCM, and WSSA. Alabama lacks sufficient information to confirm that Deputy Assistant Secretary Lamont had authority to exercise those functions. Alabama brings this action against the Assistant Secretary in his official capacity only.

5. Defendant Lieutenant General Todd T. Semonite, Commander and Chief of Engineers, U.S. Army Corps of Engineers ("Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The Commander maintains his office in Washington, D.C. Alabama brings this action against the Commander in his official capacity only.

6. Defendant Brigadier General C. David Turner, Division Commander for the South Atlantic Division of the Corps ("Division Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The Division Commander maintains his office in Atlanta, Georgia. Alabama brings this action against the Division Commander in his official capacity only.

7. Defendant Colonel James A. DeLapp, District Commander for the Mobile District of the Corps ("District Commander"), is the official responsible for certain actions taken by the Corps relating to this complaint. The District Commander maintains his office in Mobile, Alabama. Alabama brings this action against the District Commander in his official capacity only.

8. In addition to being responsible for and approving the acts and omissions of the Corps relating to this complaint, the Secretary, Assistant Secretary, Commander, Division Commander, and District Commander are responsible for the Corps' compliance with any judgment or decree of this Court.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this complaint to set aside the Corps' final agency action under 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 701-706.

10. Venue is proper in this Court under 28 U.S.C. §1391(e). The Corps' headquarters are in this District, and the Secretary, Assistant Secretary, and Commander maintain offices here. Deputy Assistant Secretary Lamont, purporting to perform the duties of the Assistant Secretary, purported to sign the Record of Decision for the FEIS, WCM, and WSSA.

## FACTUAL AND LEGAL BACKGROUND

### *Geographic background*

11. This case arises from the Corps' operations of reservoirs within the ACF River Basin. The Apalachicola, Chattahoochee, and Flint rivers, their tributaries, and their drainage areas form the basin.

12. The Chattahoochee River forms a large portion of the eastern border between Alabama and Georgia. The Chattahoochee starts in Georgia, and flows southwest towards Alabama, where it flows south before emptying into Lake Seminole at the Florida-Georgia line.

13. The Corps operates several reservoir projects in the ACF Basin, and particularly in the Chattahoochee River Basin, along the Alabama border. These projects include the West Point Dam (associated with West Point Lake), the W.F. George Lock and Dam (associated with Walter F. George Lake, also known as Lake Eufala), and George Andrews Lock and Dam (associated with Lake George W. Andrews). The Corps also operates projects within the ACF Basin, the Buford Project (associated with Lake Lanier) in Georgia and Jim Woodruff Lock and Dam (associated with Lake Seminole) on the Florida-Georgia line.

14. Approximately 2,800 square miles of the ACF River Basin lie within Alabama's borders. More than 300,000 people live in the Alabama counties within the basin.

15. The ACF River Basin is vital to Alabama's water supply and economic growth. A number of local governments, farms, and companies utilize the Basin's water. These uses, individually and in concert, will only increase in the years to come. Already, however, the flows of the ACF River Basin cause entities to face significant difficulties in making discharges and withdrawals without violating state and federal water-quality standards.

16. Alabama has substantial recreational interests in the ACF River Basin. Lake George W. Andrews, Walter F. George Lake, and West Point Lake provide tourism opportunities and economic benefits in Alabama. Alabama maintains a significant park, Lakepoint Resort State Park, at Walter F. George. Decreased flows and water levels negatively impact the park's revenues and adversely affect fisheries in Alabama.

17. Navigation has long been an important ACF function for Alabama. A navigation channel runs through the Chattahoochee River from Phenix City, Alabama, to the Gulf Intracoastal Waterway in Florida. Alabama owns and maintains three dock and terminal facilities along this channel. Beginning in the 1990s, an absence of reliable flows have caused substantial reductions in shipments at the docks. In addition, reduced flows pose navigation problems for the Farley Nuclear Plant near Columbia, Alabama, which sometimes needs critical equipment to be delivered by barge.

*The Corps' previous manuals governing operations in the ACF River Basin*

18. The Corps has used manuals to govern its operations in the ACF River Basin.

19. The Corps prepared and finalized one manual for the ACF River Basin in 1958 ("1958 Manual").

20. While the Corps was conducting its ACF operations under the 1958 Manual, Congress passed, and the President signed, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"). NEPA requires the Corps to issue an environmental-impact statement ("EIS") concerning any significant changes to its ACF operations.

21. In accordance with that obligation under NEPA, the Corps prepared final environmental-impact statements relating to its ACF operations in 1976, to the Buford Dam in 1974, and Walter F. George Lock and Dam in 1979. Each of these final environmental-impact statements corresponded to the Corps' operations under the 1958 Manual.

22. In 1989, the Corps issued a draft manual ("1989 Draft Manual"), but the Corps never finalized that manual. The Corps also never subjected the 1989 Draft Manual to the

required review and coordination under federal law, including NEPA and the Corps' own regulations.

23. The Corps purported to operate the ACF River Basin under the 1989 Draft Manual, rather than the legitimate 1958 Manual, from 1989 until the time it adopted the manual that is the subject of this complaint.

## THE CORPS' WATER CONTROL MANUAL, WATER SUPPLY STORAGE ASSESSMENT, AND FINAL ENVIRONMENTAL IMPACT STATEMENT

*The Corps' notice and implementation of the WCM, WSSA and FEIS*

24. In 2015, the Corps prepared a draft revised environmental-impact statement for a draft revised Water Control Manual and Water Supply Storage Assessment for the ACF Basin.

25. Alabama, through its Office of Water Resources, provided timely comments objecting to various aspects of the draft revised environmental-impact statement, Water Control Manual, and Water Supply Storage Assessment.

26. In December 2016, the Corps provided public notice of the Final Environmental Impact Statement ("FEIS"), Master Water Control Manual ("WCM"), and Water Supply Storage Assessment ("WSSA") for the ACF River Basin. The Master Water Control Manual included the master water-control manual and individual project water-control manuals.

27. The final WCM, WSSA, and FEIS failed to adequately address valid comments and objections made by Alabama in response to the draft versions.

28. Alabama and its Office of Water Resources, Department of Environmental Management, and Department of Conservation and Natural Resources timely renewed their comments and made additional comments in 2017.

29. Without adequately addressing the expressed concerns of Alabama and numerous other commenters, Deputy Assistant Secretary Lamont, purporting to exercise the duties of the Assistant Secreary, signed the Record of Decision for the WCM, WSSA, and FEIS on March 30, 2017.

30. The Corps is now conducting its operations in the ACF River Basin under the WCM, WSSA, and FEIS.

31. The Defendants' acts and omissions in adopting the WCM, the WSSA, and the FEIS, all supporting analysis and documentation, and a final Record of Decision constitute final agency action reviewable under the Administrative Procedure Act ("APA").

32. The WCM, WSSA, and FEIS are contrary to law in numerous ways. They will cause injury to Alabama. The WCM and WSSA will allow the Corps to operate its ACF River Basin projects in an arbitrary and capricious manner that will reduce the quantity of flows into Alabama, change the timing of flows into Alabama, and reduce the quality of water that flows into Alabama. As a direct result, Alabama will suffer injury to its citizens, economy, and environment.

*The WCM and WSSA's direct-withdrawal allocations for Georgia water supply from Lake Lanier*

33. In violation of the Water Supply Act of 1958, 43 U.S.C. § 390b, and the D.C. Circuit's decision in *Southeastern Federal Power Customers v. Geren*, 514 F.3d 1316, 1324 (D.C. Cir. 2008) ("SeFPC"), the WCM and WSSA bypass Congress and reallocate storage space from the Corps' federal facility at Lake Lanier, also known as the Buford Project, for 222 million gallons per day ("mgd") worth of direct withdrawals by Georgia and its political subdivisions. This complaint will refer to Georgia and its political subdivisions collectively as "Georgia."

34. In addition to the federal storage space needed to accommodate 222 mgd of Georgia's direct withdrawals, the WCM and WSSA also reallocate storage for a further 10 mgd in direct withdrawals, based on the Corps' miscalculation of the allowances granted by existing contracts with the Georgia cities of Buford and Gainesville.

35. The Corps has premised its reallocation of federal storage space for Georgia's direct withdrawals on the Water Supply Act of 1958, 43 U.S.C. § 390b. The Water Supply Act requires the Corps to obtain approval from Congress before it makes any reallocation of storage space for state and local water supply that would "seriously affect the purposes for which the project was authorized" or "involve major structural or operational changes." 43 U.S.C. § 390b(e).

36. The WCM and WSSA's reallocation of storage space for Georgia's direct withdrawals would seriously affect the purposes for which the Buford Project at Lake Lanier was authorized, and would seriously affect the purposes for which the Corps' other projects throughout the ACF Basin were authorized, including the Corps' projects at West Point, W.F. George, and the George Andrews Lock and Dam. Likewise, the WCM and WSSA's reallocation of storage space for Georgia's direct withdrawals would involve major structural or operational changes at the Buford Project, and also would involve major structural or operational changes at other projects within the ACF system, including the Corps' projects at West Point, W.F. George, and the George Andrews Lock and Dam.

37. The Corps' reallocation of this amount of Lanier's storage space without congressional approval flouts the D.C. Circuit's decision in *SeFPC*.

38. The D.C. Circuit in *SeFPC* determined whether the Corps' reallocation of storage space from Lake Lanier for water supply amounted to major operational change by referencing

the total amount of storage reallocated, as a percentage of the storage space available within the reservoir's pool available for non-flood-related purposes, also known as the conservation pool. *See SeFPC*, 514 F.3d at 1324.

39. The D.C. Circuit in *SeFPC* held that "[o]n its face, then, reallocating more than twenty-two percent (22%, approximately 241,000 acre feet) of Lake Lanier's storage capacity to local consumption uses . . . constitutes the type of major operational change referenced by the [Water Supply Act]." *Id.* The D.C. Circuit also stated that "[e]ven a nine percent (9%, approximately 95,000 acre feet) increase over 2002 levels for twenty years is significant." *Id.*

40. The WCM and WSSA flout the Water Supply Act and the D.C. Circuit by reallocating storage space for Georgia's water-supply use corresponding with direct withdrawals of 222 mgd. This reallocation corresponds with 254,170 acre-feet and thus 23.7% of Lake Lanier's acre-foot conservation pool, more than what the D.C. Circuit held to constitute major operational change.

41. The WCM and WSSA's reallocation for Georgia's direct withdrawals will cause a 14.48% drop in Buford's energy production, or a decrease of 20,169 megawatt hours per year.

42. The Corps' projects downstream of Lanier will have 126.5 mgd less to work with after its direct withdrawal allocations to Georgia. The annual equivalent storage space associated with the 126.5 mgd reduction, 141,432 acre-feet, would correspond with 46% of the West Point conservation pool and 61% of the Walter F. George conservation pool. Those volumes, in turn, account for approximately 6 feet of elevation in West Point's 15-foot conservation pool and 4 feet of elevation in Walter F. George's 6-foot conservation pool. The Corps either would have to allow elevations in those two lakes to go down by those amounts or make fewer releases

downstream. Either way, the alterations will involve major operational change at these projects and in the system as a whole.

43. Even assuming the 43% return rate, direct withdrawals of 222 mgd will reduce hydropower generation at other Corps projects in the ACF Basin by a substantial amount. Projected average annual West Point generation will drop by 4.26%, from 182,623 MWh to 174,840 MWh. Projected average annual generation at W.F. George will drop by 1.86%, from 474,460 MWh to 465,617 MWh. The total average annual loss at all ACF projects due to the WCM and WSSA's reallocation of Lanier's storage space for Georgia's direct withdrawals is projected to amount to 36,795 MWh, or 4.6%.

44. The WCM and WSSA effectively allocate an additional 10 mgd of Lanier storage for direct withdrawals because they overstate, by 10 mgd, the amount of direct withdrawals that currently are authorized from the Buford Project. The only currently authorized withdrawals arise from relocation contracts with the cities of Buford and Gainesville; the Fifth Amendment authorizes those contracts as compensation for the flooding of these cities' lands during the Buford Project's construction. The WCM, WSSA, and FEIS assert that these contracts authorize 20 mgd in withdrawals, but the correct amount is 10 mgd. The Buford contract authorizes Buford to withdraw no more than 2 mgd from the lake, and the Gainesville contract authorizes Gainesville to withdraw no more than 8 mgd. *See In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1169 & nn.5-6 (11th Cir. 2011). The FEIS and WCM double that figure to 20 mgd on the theory that the Gainesville relocation contract allowed it to withdraw 18 mgd if it returned 10 mgd. But the Gainesville contract, by its terms, allows the city to "remove" only 8 mgd. It does not allow the city to remove an additional 10 mgd, especially in light of the Corps' nationwide policy not to provide direct credits for return flows.

45. The WCM and WSSA also understate the direct-withdrawal reallocation's effects by assuming, without explanation, that Georgia governments will return 43% of their withdrawals to the lake. The manual does not explain how the Corps can monitor those flows, guarantee any return amount, or enforce any return requirement. And the General Counsel of the Corps conceded in a 2012 memorandum that, if Georgia failed to make its promised returns, Georgia's requested direct withdrawals could exhaust the reservoir's storage pool during periods of critical drought.

46. The WCM further understates the proposed allocation's effects by arbitrarily assuming that Georgia will adhere to the limits placed on its withdrawals by its water-supply contracts.

47. Rather than address Alabama's concerns through the comment period, in which Alabama provided comments to the Corps' DEIS and FEIS, the Corps relies on the 2012 Stockdale Memorandum for its authority to grant Georgia's request in the WCM. The 2012 Stockdale Memorandum, however, is premised on an erroneous legal understanding of the Water Supply Act that flouts the D.C. Circuit's decision in *SeFPC*. The 2012 memorandum deviates from the traditional criterion, used by the D.C. Circuit in *SeFPC*, of determining when congressional approval for a change is required by referencing the amount of storage, as a percentage of available storage, required by the change. The 2012 Stockdale Memorandum instead opts for a nebulous, "congressional intent for the ACF System" standard that contradicts the very purpose of the Water Supply Act by giving the Corps unbounded discretion to reallocate the storage space in its ACF projects for use by state and local governments.

48. In light of all these considerations, the Water Supply Act precludes the Corps from unilaterally allocating this amount of storage for direct withdrawals. To make an allocation of this magnitude, the Corps must first seek approval from Congress.

49. Moreover, the WCM and WSSA's reallocation of Lanier's storage space for Georgia's direct withdrawals is contrary to the Corps' regulations. Engineer Regulation 1105-2-100 states that a reallocation from other project purposes may amount to no more than "15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less." ER 1105-2-100, ¶3-8(b)(5), at 3-33. Storage capacity of 50,000 acre-feet corresponds to only 43.54 mgd, significantly less than the 222 mgd allowed by the WCM and WSSA. It appears that the Corps may attempt to rely on language in a separate part of the regulation, which provides, "Reallocations which exceed the Commander's authority may be approved at the discretion of the Secretary of the Army." *Id.* ¶E-57(d)(1), at E-216. Alabama lacks information to determine whether the Secretary approved this reallocation.

*The WCM and WSSA's unauthorized reordering of project purposes through allocations for downstream river withdrawals and action zones*

50. Whereas the Water Supply blocks the Corps from implementing the proposed direct withdrawals, other legal constraints independently require the Corps to seek Congress's approval of the WCM and WSSA more generally. The Corps long has recognized that it must obtain Congress's approval before making alterations to its projects that would involve substantial changes in the relative sizes of project purposes. *See* Corps Memorandum, April 15, 2002; Corps Memorandum, January 21, 1969; *Envtl. Def. Fund v. Alexander*, 467 F. Supp. 885, 901 (N.D. Miss. 1979). Various changes proposed in WCM and WSSA, above and beyond the direct-withdrawal allocation, would have that effect.

51. On top of the direct-withdrawal allocation for Georgia's water supply, the WCM and WSSA direct the Corps to release an additional 379 mgd from Lake Lanier for Georgia's downstream withdrawals. This proposal would require an additional allocation of 433,920 acre-feet, which is 40.4% of Lanier's 1,074,645 acre-foot conservation pool. When coupled with the storage associated with the proposed reallocation for direct withdrawals, this is equivalent to more than 64% of Lanier's conservation pool. The Eleventh Circuit has erroneously held that the Rivers and Harbors Act of 1946 authorizes the Corps to make *some* releases to accommodate Atlanta's downstream withdrawals. *See In re MDL-1824 Tri-State Water Litig.,* 644 F.3d at 1166. But even if that decision were correct, the Eleventh Circuit did not hold that the Corps could, without first seeking Congress's approval, change Buford into a project that overwhelmingly focuses on water supply and diminishes the relative size of other purposes like navigation and hydropower generation.

52. The WCM also implements "action zones" in the Corps' projects that reorder the project purposes in favor of Georgia's water supply, and against hydropower generation and other purposes, even further. The last approved WCM in 1958 did not have action zones, and even the zones proposed in the never-finalized 1989 draft WCM required the Corps to generate hydropower when a project was in the upper portion of its conservation pool. Yet the WCM would give the Corps discretion to generate zero hydropower in all action zones at all times, even when reservoirs are in the highest action zone and thus relatively full. The WCM thus allows the Corps to keep Lanier's elevation high for water-supply purposes in circumstances in which earlier manuals required the Corps to make releases and generate power.

53. These problems are exacerbated by the way the WCM raises the lowest action zone, Zone 4, in which hydroelectric power demands will be met at a minimum level. The WCM

increases the minimum level of Buford's Zone 4 from 49% to 64% of the conservation pool, and raises Zone 4 in each month between July and February. This means Zone 4 will encompass between 64% and 80% of Buford's conservation pool. In the aggregate, the WCM raises composite Zone 4 at the Corps' ACF projects by elevations that correspond to over 160,000 acre-feet at the beginning of the calendar year. This will have the effect of reordering project purposes toward Georgia's water supply and against hydropower generation and navigation.

54. In aggregate, the changes implemented by the WCM and WSSA are projected to involve a 14.35% decrease in hydropower generation at Buford when compared to the appropriate baseline. The Corps' data also shows that the WCM and WSSA will cause Lanier's conservation pool to drop out of Zone 1, where hydropower generation is likely at its highest, 15% more frequently than would the appropriate baseline.

55. In aggregate, the changes implemented by the WCM and WSSA are projected to cause a 3.51% drop in hydropower generation at the Corps' project at West Point as compared to the appropriate baseline.

56. In aggregate, the changes implemented by the WCM and WSSA are projected to cause a 1.68% drop in hydropower generation at the Corps' project at W.F. George as compared to the appropriate baseline.

57. In aggregate, the changes implemented by the WCM and WSSA are projected to cause a 3.33% drop in hydropower generation at the Corps' projects throughout the ACF Basin as compared to the appropriate baseline.

58. In aggregate, the changes implemented by the WCM and WSSA are projected to reduce the navigation channel in the Chattahoochee River to 7 feet. The WCM provides for no

dredging to offset this reduction. As a result, the navigation channel will be available only during the wetter months.

59. In aggregate, the changes implemented by the WCM and WSSA are projected to negatively impacts downstream flows on the Chattahoochee River. Under the WCM and WSSA, elevations at W.F. George Lake are projected to fall below the initial impact level about one out of every four years. Flows at Columbus, Georgia would have fallen by up to 34% at certain times. Meanwhile, the changes implemented by the WCM and WSSA would have resulted in a substantial increase in the number of days, by 31%, when flows at Columbia, Alabama would not have exceeded 2000 cfs.

*The WCM and WSSA's adverse water-quality impacts*

60. Section 313(a) of the Clean Water Act, 33 U.S.C. §1323(a), and the Corps' implementing regulations and guidance require the Corps to implement a water-quality management program that, among other things, "[e]nsure[s] that water quality, as affected by the project and its operation, is suitable for project purposes, existing water uses, and public health and safety and is in compliance with applicable Federal and state water quality standards." WATER QUALITY AND ENVIRONMENTAL MANAGEMENT FOR CORPS CIVIL WORKS PROJECTS, ER 1110-2-8154, (May 31, 1995). The Corps' regulations and guidance also require it to "[e]nsure that the project and its operation offer the lowest stress possible on the aquatic environment." *Id.*; *see also* 33 C.F.R. pt. 222.5(f).

61. The Clean Water Act and the Corps' regulations and guidance also require it to assess whether it could take measures to alleviate these downstream environmental

consequences. *See* WATER QUALITY AND ENVIRONMENTAL MANAGEMENT FOR CORPS CIVIL WORKS PROJECTS, ER 1110-2-8154, at pages 2-4 (May 31, 1995).

62. The FEIS provides for reduced flows that will result in detrimental downstream impacts, including an adverse effect on downstream levels of dissolved oxygen, phosphorous, nitrogen, and chlorophyll *a*.

63. Rather than assess whether the Corps could take steps to alleviate these detrimental downstream impacts, the FEIS simply identifies those impacts and tells stakeholders they must rely on the Georgia Department of Environmental Protection and other third parties to make changes to discharge permits.

64. The Clean Water Act and the Corps' regulations and guidance do not allow it to simply place and transfer the burdens of maintaining water quality on others.

65. The Corps' regulations and guidance require it to maintain the existing instream water uses and the water quality necessary to protect them.

66. EPA offered criticisms of the draft ACF WCM and EIS raising these concerns. Rather than implementing a WCM and WSSA that would appropriately mitigate water-quality violations, the Corps asserted that "NPDES permit and total maximum daily loads are the responsibility of the designated state agency under the Clean Water Act." In response to the EPA's expressed concerns, the Corps recommended that the EPA "contact GAEPD, the designated authority in Georgia that oversees part of the Clean Water Act, to ensure that the NPDES permits are revised." That approach is not the path marked by either the CWA or the Corps' own regulations. As the EPA has noted, "[t]he USACE, like all other federal agencies, is required to ensure that all federal, state, interstate, and local requirements including water quality

standards are met when developing a Water Control Manual, which includes not creating conditions that impair water quality standards."

67. The Corps has acted arbitrarily and capriciously in failing to follow the Clean Water Act and the Corps' own regulations and guidance.

68. The Corps' change in policy in requiring downstream parties to deal with detrimental downstream impacts is contrary to the settled expectations of Alabama and its citizens in water quality in the ACF River Basin, and the Corps has not provided a sufficiently substantial explanation for this change of policy.

*The FEIS's erroneous analysis of No-Action and Proposed-Action Alternatives*

69. NEPA required the Corps, when it prepared the FEIS, to determine a "No-Action Alternative." Under NEPA, the No-Action Alternative represents the effect on the environment if an agency does not adopt a proposed administrative action. NEPA required the Corps to evaluate the environmental impact of the WCM ("Proposed-Action Alternative") against the No-Action Alternative.

70. In the FEIS, the Corps determined the No-Action Alternative by incorporating effects on the environment that were created by practices and operations associated with the 1989 Draft Manual.

71. NEPA did not allow the Corps to use practices and operations implemented by the 1989 Draft Manual to determine the No-Action Alternative because the 1989 Draft Manual was not subject to the appropriate review and coordination required by NEPA and federal law.

72. NEPA required the Corps to use, in determining the No-Action Alternative, the operations that existed at the time of the last final environmental-impact statements prepared for

the Corps' projects in the ACF River Basin. Alabama understands that the Corps last produced final environmental impact statements for Lake Lanier and the Buford Dam in 1974, for Lake Seminole, the Woodruff Dam, and the ACF system generally in 1976, and for Walter F. George in 1979. Each of those FEISs corresponded to the Corps' operations under the water-control manual issued in 1958. The 1958 operations therefore establish the proper No-Action Alternative for NEPA purposes.

73. The FEIS relies on the 1989 Draft Manual for comparison purposes, even while it admits that the 1989 Draft Manual was never finalized or formally approved. The Corps is estopped from taking this approach. To obtain the dismissal of the multi-state ACF litigation, the Corps successfully argued that the 1989 update did not constitute a "final agency action" subject to judicial review, because it had not "performed the cost analyses or prepared the written reports required by the WSA, the Corps' internal guidelines, and the National Environmental Policy Act to make permanent reallocations." *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d at 1181. The Corps cannot now pretend that the changes effectuated by the 1989 Draft Manual are built into the NEPA baseline and thereby insulated from NEPA review.

74. Even if NEPA allowed the Corps to determine the No-Action Alternative by using practices and operations implemented by the 1989 Draft Manual, the FEIS's determinations of the No-Action Alternative and the Proposed-Action Alternative are inaccurate in several respects.

75. The FEIS's No-Action Alternative does not line up with historical flows at Columbus or Columbia. For example, the Columbia flows reported by the No-Action Alternative between May and October 2007 were 13% lower than the flows actually observed during that

time. Likewise, the Columbus flows reported by the No-Action Alternative for June through November 2007 were 17% lower than observed flows at that location.

76. The No-Action Alternative is equally problematic when compared to historical elevations at the Corps' projects. At Lanier, the No-Action Alternative portrays elevations that are at times higher than what actually occurred. At West Point, the No-Action Alternative portrays elevations that are at times lower than what actually occurred. At Walter F. George, the No-Action Alternative portrays elevations that are at times higher and more stable than what history shows.

77. The Proposed-Action Alternative is flawed because it fails to incorporate the possibility, in light of the WCM's action zones, of the Corps not generating hydropower equivalent to that specified in the WCM and FEIS.

**COUNT ONE**
**(Violation of the Water Supply Act and Corps' regulations)**

78. Alabama adopts and incorporates by reference paragraphs 1-49 of this complaint.

79. The Water Supply Act required the Corps to obtain approval from Congress before it made any reallocation of Lanier's storage space for Georgia's direct withdrawals that would "seriously affect the purposes for which the project was authorized" or "involve major structural or operational changes." 43 U.S.C. § 390b(e).

80. The reallocation of Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA seriously affects the purposes of the Buford project and results in major operational change at the Buford project.

81. The reallocation of Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA seriously affects the purposes of the Corps projects in the ACF Basin as a whole and results in major operational change at those projects.

82. The Corps regulations preclude the Corps from reallocating "15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less" for water supply purposes without congressional approval. ER 1105-2-100, ¶3-8(b)(5), at 3-33.

83. The Corps did not obtain congressional approval before reallocating Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA.

84. The Corps' action in reallocating Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA without first obtaining congressional approval violates the Water Supply Act.

85. The Corps' action in reallocating Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA without first obtaining congressional approval independently violates the Corps' regulations. To the extent that the Corps claims authority to exceed the limits in its regulations through approval of the Secretary, the Record of Decision does not reflect the Secretary's approval of the reallocation.

86. As detailed above, Alabama is harmed by the Corps' action in reallocating Lanier's storage space for Georgia's direct withdrawals in the WCM and WSSA.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with its prayer for relief below.

**COUNT TWO**
**(Unlawful abandonment and reordering of authorized project purposes)**

87. Alabama adopts and incorporates by reference paragraphs 1-32 and 50-59 of this complaint.

88. The Corps cannot undertake substantial shifts in the relative sizes and scope of project purposes at projects within the ACF Basin without congressional approval.

89. The Corps cannot abandon one of the congressionally mandated operating purposes of a project within the ACF Basin without congressional approval.

90. The Corps cannot subordinate a congressionally mandated operating purposes of a project within the ACF Basin to another purpose, including an unauthorized purposes, without congressional approval.

91. The WCM and WSSA unlawfully abandon the congressionally authorized purposes of navigation at projects in the ACF Basin.

92. The WCM and WSSA unlawfully subordinate project purposes like hydropower generation and navigation in favor of Georgia's water supply.

93. The Corps' projects in the ACF River Basin were authorized for project purposes specifically identified and authorized by Congress. The Defendants have a duty to operate and manage these reservoirs according to those authorized purposes. They do not have authority to abandon, re-order, or significantly impair those authorized purposes.

94. The Defendants' WCM and WSSA constitute breaches of these duties. In taking these actions, the Defendants have acted arbitrarily and capriciously, have abused their discretion, and have acted in a manner that is contrary to law.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with its prayer for relief below.

**COUNT THREE**
**(Violation of Clean Water Act and the Corps' implementing regulations)**

95. Alabama adopts and incorporates by reference paragraphs 1-32 and 60-68 of this complaint.

96. The Clean Water Act, 33 U.S.C. §1323(a), and the Corps' implementing regulations and guidance require it to implement a water-quality management program that, among other things, "[e]nsure[s] that water quality, as affected by the project and its operation, is suitable for project purposes, existing water uses, and public health and safety and is in compliance with applicable Federal and state water quality standards." WATER QUALITY AND ENVIRONMENTAL MANAGEMENT FOR CORPS CIVIL WORKS PROJECTS, ER 1110-2-8154, (May 31, 1995). The Corps' regulations and guidance also require it to "[e]nsure that the project and its operation offer the lowest stress possible on the aquatic environment." *Id.*

97. The WCM is contrary to these regulations and guidance.

98. The Defendants' violation of the Corps' regulations and guidance is arbitrary and capricious.

99. These failures by the Defendants infringe on Alabama's rights and legal obligations.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with its prayer for relief below.

**COUNT FOUR**
**(Violation of NEPA)**

100. Alabama adopts and incorporates by reference paragraphs 1-32 and 69-79 of this complaint.

101. NEPA and its implementing regulations required the Defendants to conduct a proper environmental-impact analysis of the WCM.

102. The FEIS for the WCM is unlawful in light of the considerations discussed above.

103. Alabama has direct and substantial interests in the Defendants' compliance with the provisions of NEPA and is within the zone of interests protected by NEPA.

WHEREFORE, Alabama respectfully requests that this Court enter an order in favor of Alabama consistent with the prayer for relief below.

**COUNT FIVE**
**(Violation of the Administrative Procedure Act)**

104. Alabama adopts and incorporates by reference the preceding paragraphs of this complaint.

105. The Corps' final agency action issuing the Record of Decision, WCM, WSSA, and FEIS is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for at least the following reasons:

a. It is contrary to the requirements of Pub. L. No. 79-525, 60 Stat. 634 (1946); the Clean Water Act; the Water Supply Act; the Rivers and Harbors Act; and the National Environmental Policy Act;

b. It is contrary to the Corps' own regulations governing the Corps' operation of projects in the ACF system;

c. It is contrary to the Corps' own regulations defining its responsibilities under the Clean Water Act;

d. It is contrary to the Corps' own regulations concerning water-supply allocations;

e. It is an unexplained and unjustified departure from precedent;

f. It fails to provide a substantial justification for upsetting reliance interests of affected parties;

g. It fails to adequately justify the proposed changes to the operation of projects in the ACF system;

h. It fails to respond meaningfully to objections provided by commenters;

i. It is based on irrelevant, impermissible, or arbitrary factors;

j. It fails to consider alternatives that would have been superior to the Corps' preferred approach to the operation of projects in the ACF system;

k. It fails to provide a reasoned basis for the Corps' decisions based on the record evidence; and

l. It is not supported by substantial evidence.

**PRAYER FOR RELIEF**

Alabama respectfully requests the Court to issue the following relief against the Defendants under the APA, the Declaratory Judgment Act, and any other applicable federal law:

1. Issue an order under 5 U.S.C. § 706 holding unlawful and setting aside the WCM, including but not limited to the individual water-control manual for the Buford Project and the WSSA;

2. Issue an order under 5 U.S.C. § 706 holding unlawful and setting aside the WSSA;

3. Issue an order under 5 U.S.C. § 706 holding unlawful and setting aside the FEIS;

4. Issue an order under 5 U.S.C. § 706 or 28 U.S.C. § 1361 directing the Defendants either to revise the WCM or to prepare new manuals for the ACF River Basin consistent with the

congressionally authorized purposes of projects in the ACF River Basin, and to ensure that downstream flow conditions in Alabama are consistent with historic flows;

5. Issue an order under 5 U.S.C. § 706 or 28 U.S.C. § 1361 directing the Defendants either to revise the WSSA or to prepare a new water-supply decision for the ACF River Basin consistent with the Water Supply Act and the Corps' regulations, and to ensure that downstream flow conditions in Alabama are consistent with historic flows;

6. Issue an order under 5 U.S.C. § 706 or 28 U.S.C. § 1361 directing the Defendants to modify, as necessary, the WCM, WSSA, or any part thereof to ensure that the Corps' operations will protect and maintain federal and state water quality standards;

7. Issue an order under 5 U.S.C. § 706 or 28 U.S.C. § 1361 directing the Defendants either to revise its FEIS or to prepare a new FEIS for any revised or new manuals for the ACF River Basin consistent with federal law;

8. Award Alabama attorneys' fees and costs; and

9. Award other relief as the Court may deem just and proper to protect Alabama's interests.

Respectfully submitted,

s/ John C. Neiman, Jr.
One of the Attorneys for the State of Alabama

**OF COUNSEL:**

John C. Neiman, Jr.
John A. Earnhardt
MAYNARD COOPER & GALE P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
(205) 254-1000
jneiman@maynardcooper.com

jearnhardt@maynardcooper.com

Andrew L. Brasher (appearing under LCvR 83.2(f))
OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36104
334-242-7300
abrasher@ago.state.al.us

**DEFENDANTS TO BE SERVED AT THE FOLLOWING ADDRESSES:**

U.S. Army Corps of Engineers
Headquarters
441 G Street NW
Washington, DC 20314-1000

Robert M. Speer
Acting Secretary of Army
101 Army Pentagon
Washington, DC 20310-0101

Douglas Lamont
Senior Official Exercising the Functions of the Assistant Secretary of U.S. Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108

Lieutenant General Todd T. Semonite
Commander and Chief of Engineers
Headquarters
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

Brigadier General C. David Turner
Division Commander, South Atlantic Division
U.S. Army Corps of Engineers
60 Forsyth Street SW, Room 10M15
Atlanta, Georgia 30303-8801

Colonel James A. DeLapp
District Commander, Mobile District
U.S. Army Corps of Engineers
P.O. Box 2288
Mobile, Alabama 36628-0001