# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ALABAMA,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>    Defendants,<br><br>THE STATE OF GEORGIA, ATLANTA REGIONAL COMMISSION, et al.,<br><br>    Defendant-Intervenors. | Civil Action No. 17-607 (JDB) |

## MEMORANDUM OPINION

Alabama filed this lawsuit to set aside a decision by the U.S. Army Corps of Engineers (the "Corps") to grant Georgia's request for additional water supply from a federal reservoir, Lake Lanier, which is located within the Northern District of Georgia. Georgia and a group of Georgia Water Supply Providers have moved to transfer the case to the Northern District of Georgia, or alternatively to the Southern District of Alabama.

A decision in this case will most directly impact nearly four million Georgians who depend on Lake Lanier for their water supply. More broadly, it will affect people, economies, recreation, and navigation throughout the entire Apalachicola-Chattahoochee-Flint Basin (the "ACF Basin"), a network of waterways in Georgia, Alabama, and Florida, all hundreds of miles from this district. No direct real-world effects will be felt by anyone within this district. The challenged decision was made by Corps personnel located within the Eleventh Circuit, either in Atlanta in the Northern District of Georgia or in Mobile in the Southern District of Alabama. Moreover, the decision was made pursuant to a 2011 decision from the Eleventh Circuit in litigation involving these same

1

parties, in which the court opined on the scope of the Corps' authority to grant Georgia's water supply request, and remanded the case to the Corps to make the very decision that is now being challenged. Yet Alabama chose to file this lawsuit hundreds of miles from home, purportedly because it involves an issue of national concern that necessitates a "neutral" forum. But Alabama's choice also appears motivated by its desire to leverage an earlier D.C. Circuit decision, which was subsequently interpreted by the Eleventh Circuit when it remanded the case to the Corps. In these circumstances, Alabama's choice of forum is entitled to little deference, and the relevant private- and public-interest factors strongly weigh in favor of transferring this case to the Northern District of Georgia. Hence, the Court will grant the transfer motions.

## BACKGROUND

### I. THE ACF BASIN

The ACF Basin covers more than 19,500 square miles in Georgia, Alabama, and Florida. Approximately 75% of the land area and 90% of the population of the ACF Basin are located within Georgia. The Chattahoochee River flows from the mountains of North Georgia across the state, runs along the Georgia-Alabama border, and then joins the Flint River at the Florida-Georgia border to form the Apalachicola River. Those three rivers, their tributaries, and the associated drainage area form the ACF Basin.

The Corps operates five federal dams within the ACF Basin. The largest is the Buford Dam, which forms Lake Lanier, a reservoir located about fifty miles north of Atlanta. Lake Lanier and the Chattahoochee River below it are the primary water supply sources for metropolitan Atlanta. South of Lake Lanier are three dams located along the Georgia-Alabama border: West Point Dam, Walter F. George Lock and Dam, and George Andrews Lock and Dam. The southernmost dam in the ACF Basin is Jim Woodruff Lock and Dam, which forms Lake Seminole

2

at the Georgia-Florida border. The Corps is charged with managing water storage at these reservoirs. It does so by developing water control plans and manuals, which explain how the Corps will operate its reservoirs to fulfill federal objectives while balancing competing interests.

## II. HISTORY OF THE ACF BASIN LITIGATION

In its brief, Georgia aptly described the history of this litigation as "labyrinthine." Georgia's Mot. to Transfer [ECF No. 25-1] at 7. This lawsuit is the latest in a long series of challenges to the Corps' management of the reservoirs within the ACF Basin. All prior cases have either originated in or been transferred to courts within the Eleventh Circuit, and the instant case emanates from a 2011 decision by the Eleventh Circuit.

### A. Alabama v. U.S. Army Corps of Engineers (N.D. Ala. 1:90-cv-1331)

In 1989, the Corps issued a draft report that proposed to reallocate storage in Lake Lanier to accommodate water supply needs in metropolitan Atlanta. See In re MDL-1824 Tri-State Water Rights Litig., 644 F.3d 1160, 1173 (11th Cir. 2011). Alabama filed suit in the Northern District of Alabama to challenge that proposal. Shortly thereafter, the case was stayed to allow the parties to engage in settlement negotiations. Id. at 1174. The negotiations led to an interstate compact (the "ACF Compact") between Georgia, Alabama, and Florida, which was ratified by Congress in 1997. Id. The ACF Compact established a structure for making decisions and resolving disputes, but it did not specify how the waters of the ACF Basin would be shared. The ACF Compact expired in 2003 when the parties "failed to agree on a water allocation formula." Id. at 1175.

### B. SeFPC v. U.S. Army Corps of Engineers (D.D.C. 1:00-cv-2975)

Meanwhile, an industry group that represents hydropower purchasers in the ACF Basin—the Southeastern Federal Power Customers, Inc. ("SeFPC")—filed an APA lawsuit in this district alleging that the Corps "had wrongfully diverted water from hydropower generation to water

3

supply, thereby causing SeFPC's members to pay unfairly high rates for their power." Id. The case was referred to mediation, and Georgia and the Georgia Water Supply Providers intervened. In January 2003, SeFPC, the Corps, Georgia, and the Georgia Water Supply Providers reached a settlement, under which 22% of Lake Lanier's storage was allocated to local consumption uses; Alabama and Florida then intervened to contest the settlement. Id. The D.C. Circuit invalidated the settlement agreement, concluding that the Corps had exceeded its authority under the Water Supply Act of 1958 ("WSA") because the 22% reallocation was a "major operational change" that required congressional approval. See Se. Fed. Power Customers, Inc. v. Geren, 514 F.3d 1316, 1324–25 (D.C. Cir. 2008). After the D.C. Circuit remanded the case, it was transferred to the multi-district litigation ("MDL") proceeding that was by then pending in the Middle District of Florida. See Tri-State Water Rights Litig., 644 F.3d at 1176.

### C. Georgia v. U.S. Army Corps of Engineers (N.D. Ga. 2:01-cv-26)

Shortly after the SeFPC case was filed, Georgia requested that the Corps allocate water from Lake Lanier to meet the needs of metropolitan Atlanta through 2030. The Corps did not respond to Georgia's request, and Georgia filed suit in the Northern District of Georgia. See id. After the Corps rejected Georgia's request, Alabama intervened and moved to transfer the case to the Northern District of Alabama—where its own suit against the Corps was pending—or to have it abated. The court held that the case would be abated pending resolution of the case in the Northern District of Alabama. Georgia v. U.S. Army Corps of Eng'rs, 223 F.R.D. 691, 699 (N.D. Ga. 2004).

### D. The Tri-State Water Rights MDL

After Florida entered the fray by filing a suit against the Corps in 2006, the Georgia Water Supply Providers filed a motion with the Judicial Panel on Multidistrict Litigation (the "MDL

4

Panel") seeking to consolidate these cases into a single proceeding. See In re Tri-State Water Rights Litig., 481 F. Supp. 2d 1351, 1352 (J.P.M.L. 2007). The MDL Panel granted the motion, finding that "the core disputes in this litigation primarily affect parties and interests located within the Eleventh Circuit." Id. at 1353. The cases were centralized in the Middle District of Florida.

### E. The Eleventh Circuit's Decision

The formation of the MDL led to a landmark Eleventh Circuit decision concerning water rights in the ACF Basin. In 2011, the Eleventh Circuit held that the Corps had erred in rejecting Georgia's request on the grounds that water supply was not among the congressionally authorized uses of Lake Lanier. See Tri-State Water Rights Litig., 644 F.3d at 1192. The Eleventh Circuit held that the Corps' authority under the original authorizing statute was supplemented by the WSA, and that a combination of these and other authorities might enable the Corps to grant Georgia's request. Id. at 1192–97. The Eleventh Circuit remanded the case with detailed instructions for the Corps to reconsider Georgia's request. The Eleventh Circuit ordered the Corps to complete its analysis and release its conclusions within one year, and the court maintained jurisdiction to monitor compliance. Id. at 1200–1205.

In reaching this decision, the Eleventh Circuit considered the D.C. Circuit's earlier decision in SeFPC. The Eleventh Circuit rejected Alabama's arguments that the SeFPC decision precluded a finding by the Corps that it had authority to grant Georgia's water supply request. Id. at 1179, 1201–05. The Eleventh Circuit determined that the D.C. Circuit's decision did not have preclusive effect because, among other reasons, the question of what constitutes the appropriate measure of "operational change was not actually litigated" in SeFPC. Id. at 1203. Accordingly, the Eleventh Circuit instructed the Corps that it was not "bound by collateral estoppel . . . and should make its decisions on remand based on its own reasoned analysis." Id. at 1205.

### III. THE ADOPTION OF THE ACF MANUAL

Thereafter, the Corps proceeded to review Georgia's water supply request pursuant to the Eleventh Circuit's remand instructions. In June 2012, the Corps concluded that it was legally authorized to grant Georgia's water supply request. In doing so, the Corps concluded that the standard adopted by the D.C. Circuit in SeFPC was not the correct measure for determining its authority under the WSA.[1] Having concluded that it was authorized to grant Georgia's request, the Corps proceeded with an environmental impact study relating to the request. On March 30, 2017, the Corps formally adopted the Final Environmental Impact Statement ("FEIS"),[2] the ACF Manual, and the Water Supply Storage Assessment. Compl. ¶ 29.

### IV. THE INSTANT LITIGATION

Alabama filed this lawsuit days after the Corps adopted the FEIS and the ACF Manual. Alabama challenges various aspects of these decisions, including the Corps' decision to allocate storage from Lake Lanier to meet water supply needs in Georgia. Id. ¶¶ 33–49. Among other things, Alabama alleges that the decision to reallocate storage from Lake Lanier "flouts the D.C. Circuit's decision in SeFPC." Id. ¶ 37. Alabama alleges that the decision will harm Alabama's citizens and a variety of local interests. Id. ¶¶ 14–17.

Georgia and the Georgia Water Supply Providers have intervened and have moved to transfer this case to the Northern District of Georgia, or alternatively to the Southern District of

---

[1] See U.S. Army Corps of Engineers, Authority to Provide for Municipal and Industrial Water Supply from the Buford Dam/Lake Lanier Project, Georgia, at 34–42 (June 25, 2012), http://water.sam.usace.army.mil/WSA_Memo_Jun_12.pdf [hereinafter "Stockdale Memorandum"]; Compl. [ECF No. 1] ¶ 47.

[2] See U.S. Army Corps of Engineers, Update of the Water Control Manual for the Apalachicola-Chattahoochee-Flint River Basin and Water Supply Assessment, Final Environmental Impact Statement, http://www.sam.usace.army.mil/Missions/Planning-Environmental/ACF-Master-Water-Control-Manual-Update/ACF-Document-Library.

Alabama. See Georgia's Mot. to Transfer at 3; Georgia Water Supply Providers' Mot. to Transfer [ECF No. 27-1] at 1. The Corps filed a notice of concurrence, stating that it "supports transfer to any district in the Eleventh Circuit where venue is otherwise proper." See Corps' Notice of Concurrence [ECF No. 28] at 1. Alabama opposes transfer.

## LEGAL STANDARD

As the law governing transfers explains: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). The analysis proceeds in two steps. First, a court must decide whether plaintiffs could have brought their case in the proposed transferee district. See Van Dusen v. Barrack, 376 U.S. 612, 624 (1964); Relf v. Gasch, 511 F.2d 804, 807 (D.C. Cir. 1975). Second, a court must exercise its "discretion . . . to adjudicate [the] motion[ ] for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citation omitted). Courts consider a number of "public" and "private" interests in making their transfer decisions, and it is the movant's burden to establish that the various factors line up in favor of transfer. See, e.g., Alaska Wilderness League v. Jewell, 99 F. Supp. 3d 112, 115 (D.D.C. 2015).

## DISCUSSION

### I. VENUE

As a threshold issue, transfer is limited to those venues where the action "might have been brought." 28 U.S.C. § 1404(a). In suits challenging federal agency action, venue is proper in any district in which "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28

7

U.S.C. § 1391(e). Alabama does not dispute that this suit could have been brought in either of the proposed transferee districts, the Northern District of Georgia or the Southern District of Alabama. Nor, realistically, could it. Alabama named as defendants the Corps' Division Commanders for the South Atlantic Division (located in Atlanta) and the Mobile District. See Compl. ¶¶ 6–7. Moreover, it is evident that Corps staff located in Atlanta and Mobile played a substantial role in developing the ACF Manual and FEIS that are at the center of this dispute. See, e.g., Georgia's Reply [ECF No. 35] at 3–5. Hence, this suit could have been brought in either of the proposed transferee districts.

## II.  BALANCE OF PUBLIC AND PRIVATE INTERESTS

Having cleared this initial hurdle, the Court must now analyze the private- and public-interest factors that underlie the case-specific discretionary transfer inquiry under § 1404. The private-interest factors include: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of witnesses, . . . and (6) the ease of access to sources of proof." Niagara Pres., Coal., Inc. v. FERC, 956 F. Supp. 2d 99, 104 (D.D.C. 2013). The public-interest factors include: (1) the transferee's familiarity with the governing laws; (2) whether one circuit is more familiar with the same parties and issues than other courts; (3) the relative congestion of each court; and (4) the local interest in deciding local controversies at home. Sheffer v. Novartis Pharm. Corp., 873 F. Supp. 2d 371, 379 (D.D.C. 2012); Weinberger v. Tucker, 391 F. Supp. 2d 241, 245 (D.D.C. 2005). Here, three of the private-interest factors weigh in favor of transfer, one is neutral, and the two remaining factors are not relevant in the context of this APA challenge. And two of the four public-interest factors tip heavily in favor of transfer, while the other two are neutral. On balance, then, the Court concludes that transfer is warranted.

### A. Private-Interest Factors

The starting point of the private-interest inquiry is the parties' respective forum choices. Although courts generally accord "substantial deference" to a plaintiff's choice of forum, Niagara Pres., Coal., Inc., 956 F. Supp. 2d at 104 (citation omitted); see W. Watersheds Project v. Pool, 942 F. Supp. 2d 93, 97 (D.D.C. 2013), that deference is diminished in certain circumstances that are present here. To begin with, plaintiff's choice is entitled to "substantially less deference" when "plaintiff chooses a forum that is not its home forum." Niagara Pres., Coal., Inc., 956 F. Supp. 2d at 104; accord New Hope Power Co. v. U.S. Army Corps of Eng'rs, 724 F. Supp. 2d 90, 95 (D.D.C. 2010); Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 52 (D.D.C. 2000). Deference is further reduced where "plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." W. Watersheds Project, 942 F. Supp. 2d at 97 (citation omitted); see Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 180 (D.D.C. 2009) ("How heavily a plaintiff's choice weighs against transfer, therefore, depends on the existence of a connection between the underlying case and this district."). In this case, Alabama's claims have no meaningful ties to this district. The challenged decision concerns the management of water supply in Lake Lanier—located in the Northern District of Georgia—which is hundreds of miles from the District of Columbia. The effects of the decision will be most acutely felt by the residents of Georgia—including four million Georgians who depend on Lake Lanier for water—and by residents of Alabama and other parts of the ACF Basin. The decision was made by personnel from the Corps' offices in Atlanta and Mobile. Zeng Decl. [ECF No. 25-2] ¶¶ 8–9. Hence, no part of this decision has any real connection to the District of Columbia, its waterways, or its people.

Recognizing the tenuous connection between the controversy and this district, Alabama

attempts to establish a sufficient nexus based on a few instances in which the Corps' leadership in Washington was involved in the update of the ACF Manual and the FEIS. See Pl.'s Opp'n [ECF No. 32] at 21 (highlighting that: (1) the Secretary of the Army directed the Corps to begin the process of revising the water control manuals, (2) the Corps' headquarters personnel twice had the opportunity to review the draft documents before they were finalized by local Corps personnel in Atlanta and Mobile, and (3) that the Acting Assistant Secretary of the Army signed the final document approving the manuals). But Alabama overstates the significance of these contacts and, in any event, they do not constitute "meaningful ties" to this district.

For instance, even though it is true that the Secretary of the Army initiated the process of updating the master water control manuals, Alabama offers no evidence that the Secretary did anything of substance to support that effort. It is settled law that "mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative," Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 25–26 (D.D.C. 2002); instead, there must be a "real connection between the District of Columbia and this litigation" that goes beyond the presence of federal agency officials who are "generally regulating and overseeing the [administrative] process," id. at 26 (alteration in original).

Alabama's second supposed connection—"that the Corps doubled the amount of Headquarters-level review that went in the manuals' revision," Pl.'s Opp'n at 21—is similarly flawed. Again, Alabama has offered no evidence of what headquarters staff actually did, such as who completed the reviews, what steps were taken, the extent of the reviews, and what effects, if any, they had on the final decision. The fact that there were two reviews, rather than one, is insignificant if neither review involved meaningful participation by the Corps' staff in this district. See Alaska Wilderness League, 99 F. Supp. 3d at 120 (granting a motion to transfer even though

10

"every Federal Register notice published by the [Fish and Wildlife] Service is subject to some level of review and sign-off by Service leadership in Washington, D.C." (citation omitted)).

Alabama also overstates the significance of the final supposed connection: that the Acting Assistant Secretary of the Army signed the final approvals. This did not occur because the ACF Manual was "tied to Washington" or because "Washington had so much interest in the parties and subject matter," as Alabama suggests, but rather because the Corps' standard operating procedures require approval for any water supply reallocation that exceeds 50,000 acre-feet.[3] In any event, this connection on its own does not weigh against transfer. See id. at 121 ("[S]igning and promulgating are not magic acts that somehow transform a transferable case into an un-transferable one."). Rather, "an official's signature . . . might serve as [a] data point[] militating against transfer, if the facts and circumstances . . . otherwise suggest that officials in Washington were significantly involved." Id.

Indeed, one of the cases that Alabama relies on, Wilderness Society v. Babbitt, 104 F. Supp. 2d 10 (D.D.C. 2000), demonstrates that meaningful ties are lacking here. In that case, environmental groups brought a suit challenging a federal decision to commence oil and gas leasing in the National Petroleum Reserve in Alaska, and the government moved to transfer the case to the District of Alaska. Id. at 11–12. The court held that the plaintiffs' choice of forum was entitled to deference based on the significant connections between agency officials in Washington and the controversy. Id. at 14–15. For example, the court recognized that the Secretary of Interior's involvement "was far from routine." Id. at 14. The Secretary had "made a six-day visit to the area, and met with and was briefed by local [] residents, government and industry officials,

---

[3] See ER 1105-2-100, at E-215 to E-216 (Apr. 22, 2000), http://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1105-2-100.pdf.

11

and scientists." Id. Not only did the Secretary sign the Record of Decision in Washington, but he also held a public briefing on the issue here. Id. The court concluded that the Secretary's "heavy involvement" demonstrated "the significance of this issue to the entire nation." Id. Here, there is simply no such involvement by any Corps official located in this district.[4]

In sum, because the connections between this controversy and this district are at best "attenuated," see Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 18 (D.D.C. 1996), the first factor—plaintiff's choice of forum—will be afforded little deference.[5]

Conversely, defendants' (and defendant-intervenors') choice of forum lines up in favor of transfer. They propose litigating this case in the Northern District of Georgia, or alternatively in the Southern District of Alabama, which "do[] have meaningful ties to the controversy." Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 55 (D.D.C. 2012). Lake Lanier is located in the Northern District of Georgia. The people, businesses, and governments that depend on the waters of Lake Lanier and the ACF Basin are in those districts. See Zitsch Decl. [ECF No. 19-2] ¶¶ 8, 9, 36; Compl. ¶¶ 14–16. And the relevant decisionmakers are located in offices in those districts. Thus, defendants "have chosen the forum wherein the project itself,

---

[4] The Georgia Water Supply Providers offer a better comparison case: Airport Working Group of Orange County, Inc. v. U.S. Department of Defense, 226 F. Supp. 2d 227 (D.D.C. 2002). In that case, environmental groups sued the Defense Department for its alleged violation of environmental statutes relating to the sale of a military base in California. The Record of Decision approving the environmental impact statement had been signed by a high-level official in Washington, id. at 228, and the Commandant of the Marines Corps who oversaw the base transfer worked at the Pentagon, id. at 230. Nevertheless, the court found that plaintiff's choice to file in this district was entitled to only "limited deference" because there was "no evidence to suggest that these officials had an active or significant role in this matter" and "any role played by the officials in the District of Columbia [was] overshadowed by the fact that their decisions were based on work done by government employees in California." Id. The same is true here.

[5] Still another reason for limited deference is the fact that Alabama's decision to file in this district appears motivated in part by its desire to leverage the D.C. Circuit's decision in SeFPC and to avoid the Eleventh Circuit's subsequent gloss on that decision. See M & N Plastics, Inc. v. Sebelius, 997 F. Supp. 2d 19, 25 (D.D.C. 2013) (granting motion to transfer where plaintiffs' decision to file "in this district instead of their home district was motivated by an attempt to take advantage of favorable precedent here"); Onyeneho v. Allstate Ins. Co., 466 F. Supp. 2d 1, 5 (D.D.C. 2006) ("To the extent that plaintiffs are engaging in forum shopping, it weighs in favor of transfer to the more appropriate forum.").

12

the decisionmakers, and the affected community are all located," giving either of the transferee districts a strong interest in the outcome of this case. Pres. Soc. of Charleston, 893 F. Supp. 2d at 55.

The third factor, where the claim arose, also strongly weighs in favor of transfer. "In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 179. Here, the decisionmaking process overwhelmingly occurred in the Corps' offices in Georgia and Alabama. Alabama acknowledges that "[t]his case arises from the Corps' operations of reservoirs within the ACF River Basin." Compl. ¶ 11. The Corps' South Atlantic Division in Atlanta has authority over "water control regulation of all Federal projects within the ACF Basin," see Zeng Decl. ¶¶ 4, 8; FEIS, Vol. 2 at 9-01, and the Mobile District "is the regulating office for the Corps' projects in the ACF Basin," FEIS, Vol. 2 at 5-6. The ACF Manual was developed by Corps' personnel in the Mobile District with oversight from the South Atlantic Division. See Zeng Decl. ¶¶ 8–9; FEIS, Vol. 1 at 7-1 to 7-5. All five public meetings concerning these projects were held in Alabama, Georgia, or Florida—none were in this district. FEIS, Vol. 1 at 1-20. Those meetings were conducted by local Corps officials, without participation from headquarters staff. See Zeng Decl. ¶ 12. Nearly all of the documents associated with the update of the ACF Manual originated in the Mobile District, including the technical documents used in the Stockdale Memorandum, which the Corps relied on to grant Georgia's water supply request. See Georgia's Reply at 4. Finally, all relevant Federal Register Notices regarding the water control manual update were issued by the Mobile District, which also collected and responded to comments. Id. at 5; Zeng Decl. ¶ 12.

The fourth factor, the convenience of the parties, "slightly tilts toward transfer." Pres. Soc.

of Charleston, 893 F. Supp. 2d at 56. Most of the parties to this litigation—including Alabama, Georgia, the Georgia Water Supply Providers, and the Corps' Division and District Commanders—are located within the Eleventh Circuit. The government defendants located in this district have requested transfer to a court in the Eleventh Circuit. See Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 48 (D.D.C. 2006) (finding "any inconvenience to [the government] is offset by the fact that they [are] the party requesting the transfer"). Thus, Alabama cannot reasonably claim that it is at least as convenient to litigate this controversy here as it would be in the Northern District of Georgia or the Southern District of Alabama (Alabama's home forum). See, e.g., Trout Unlimited, 944 F. Supp. at 18 ("The convenience of the parties . . . supports transfer of this case to Colorado. Two of the three plaintiffs . . . are located in Colorado. Plaintiffs have counsel located in Colorado."); Airport Working Grp., 226 F. Supp. 2d at 231 (finding the "convenience of the parties strongly supports transfer" when "plaintiffs and their lead counsel" live in the transferee district). Nonetheless, Alabama contends that convenience should turn on the location of the attorneys, noting that the Corps' DOJ attorneys, and the attorneys for Georgia and the Georgia Water Supply Providers, all maintain offices in this district. Pl.'s Opp'n at 4, 26. But courts have repeatedly stated that "the location of counsel carries little, if any, weight in an analysis under § 1404(a)." Reiffin, 104 F. Supp. 2d at 52 n.7 (internal quotation marks omitted); accord Pres. Soc. of Charleston, 893 F. Supp. 2d at 56; McClamrock v. Eli Lilly & Co., 267 F. Supp. 2d 33, 40 (D.D.C. 2003).

Finally, the fourth and fifth private-interest factors are not "particularly relevant to this case, which involves judicial review of an administrative decision and accordingly . . . neither discovery, witnesses, nor a trial will be required." Alaska Wilderness League, 99 F. Supp. 3d at 118 n.5 (internal quotation marks omitted). Therefore, the Court will not incorporate these factors

14

into the private-interest calculation. See Niagara Pres., Coal., Inc., 956 F. Supp. 2d at 104.

In sum, the Court finds that the private-interest calculation strongly points in the direction of transfer to the Eleventh Circuit.

### B. Public-Interest Factors

The Court begins with the final public-interest factor because the "interest in having local controversies decided at home" is preeminent. W. Watersheds Project, 942 F. Supp. 2d at 97; accord Alaska Wilderness League, 99 F. Supp. 3d at 116. Courts have recognized that justice is promoted by having a "localized controversy [] resolved in the region it impacts," W. Watersheds Project, 942 F. Supp. 2d at 102 (emphasis added) (citing Oil, Chem. & Atomic Workers Local Union No. 6–418 v. Nat'l Labor Review Bd., 694 F.2d 1289, 1300 (D.C. Cir. 1982)), and have consistently transferred cases when the challenged action predominately affects local interests, see, e.g., Trout Unlimited, 944 F. Supp. at 17–18, 20 (finding transfer appropriate where the "controversy [arose] from an administrative decision made in Colorado which directly affects Colorado's Arapaho and Roosevelt National Forests, water systems, wildlife, and more importantly, its people"). "This policy rationale applies equally to the judicial review of an administrative decision which will be limited to the administrative record." Id. at 19; see Sierra Club v. Flowers, 276 F. Supp. 2d 62, 70 (D.D.C. 2003).

Here, this "most important" public-interest factor strongly favors transfer. Pres. Soc. of Charleston, 893 F. Supp. 2d at 54. The instant controversy is decidedly local: the project is local (at Lake Lanier in Georgia), the decision was local (made by Corps' staff in Atlanta and Mobile), and the impact will be on local residents (most directly on 4 million people in Atlanta, but also on 300,000 residents of Alabama), local governments, local economies, local recreational opportunities, and local navigation. See Zitsch Decl. ¶¶ 8, 9, 36; Compl. ¶¶ 14–16; Georgia Water

15

Supply Providers' Mot. to Transfer at 17–18. Without question, the people "whose rights and interests are in fact most vitally affected by th[is] suit" reside in Georgia, Alabama, and Florida—not in the District of Columbia. Adams v. Bell, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983).

Alabama's attempts to shift this factor in its favor are unpersuasive. Alabama first argues that it is "settled" that a "controversy is not localized if it involves more than one state." Pl.'s Opp'n at 28. But the case law does not support such a rigid rule. Numerous courts in this district have transferred cases involving agency action that affects more than one state. See, e.g., Defs. of Wildlife v. Jewell, 74 F. Supp. 3d 77, 88 (D.D.C. 2014) (transferring challenge to federal listing of the lesser prairie-chicken, and finding Oklahoma had a strong local interest in resolving this dispute, even though the prairie-chicken's range spread beyond Oklahoma and into several neighboring states); Nw. Forest Res. Council v. Babbitt, No. 93-1579 JHG, 1994 WL 908586, at *3–4 (D.D.C. Apr. 13, 1994) (transferring challenge to a Fish and Wildlife Service regulation affecting a "three-state population" of seabirds, because the birds "do not inhabit land or water in—or anywhere near—the District of Columbia" and the controversy was "more appropriately litigated in a court in Oregon, Washington or California"). Alabama next argues that because "the ACF Basin flows through no fewer than four judicial districts," this creates potential "unwarranted tension between the States," Pl.'s Opp'n at 29, which necessitates a "neutral forum" in this district, id. at 24. But it is the duty of federal judges to be fair and neutral when deciding issues involving multiple states' interests—indeed, this is the very idea behind diversity jurisdiction—and Alabama has offered nothing more than rank speculation to question the ability of judges in the transferee districts to remain impartial.[6]

---

[6] Alabama also claims that this is a national, as opposed to local, controversy based on a few statements from members of Congress concerning the importance of the ACF Basin to "all of the citizens of the United States." See Pl.'s Opp'n at 16–17. But courts in this district have repeatedly rejected such arguments in the face of substantial local impacts. See, e.g., Flowers, 276 F. Supp. 2d at 68.

16

Similarly unpersuasive is Alabama's reliance on Oceana v. Bureau of Ocean Energy Management, 962 F. Supp. 2d 70 (D.D.C. 2013). There, the court considered defendants' request to transfer a lawsuit that involved questions of "national policy [and] national significance" about oil and gas exploration in the Gulf of Mexico following a "nationally significant environmental disaster [the Deepwater Horizon oil spill]." Id. at 77. The challenged activity would "take place on the outer continental shelf, beyond the bounds of any state," id., in an area that was statutorily declared to be "a vital national resource reserve held by the Federal Government for the public," id. (citing 43 U.S.C. § 1332(3)). Unlike here, the proposed transferee district had virtually no connection to the relevant decisionmaking, and (also unlike here) there were strong connections linking the District of Columbia to the controversy. Id. at 75–76.[7]

The next public-interest factor, the transferee's familiarity with the governing laws, is neutral. This case involves federal statutory claims, see Compl. at 20–25, and "all federal courts are presumed to be equally familiar with the law governing federal statutory claims," Fed. Hous. Fin. Agency v. First Tennessee Bank Nat. Ass'n, 856 F. Supp. 2d 186, 194 (D.D.C. 2012) (citation omitted); see Valley Cmty. Pres. Comm'n v. Mineta, 231 F. Supp. 2d 23, 45 (D.D.C. 2002) ("As the action concerns federal law, neither court is better suited than the other to resolve these issues.").

However, another factor that courts in this district consider is "'whether one circuit is more familiar with the same parties and issues or related issues than other courts.'" Weinberger, 391 F.

---

[7] Alabama also cites Judge Sullivan's decision in the Alabama-Coosa-Tallapoosa ("ACT") litigation in which he denied defendants' motion to transfer venue in a minute order. See July 22, 2016 Minute Order, Alabama v. U.S. Army Corps of Eng'rs, No. 15-cv-696 (D.D.C). As defendants point out, that case "involves an entirely separate river basin, challenges a different operations manual, and has vastly different procedural issues." Georgia's Reply at 18. It is this last distinction—the difference in historical and procedural context—that is most important to the transfer analysis. The ACT case, unlike this one, was not previously addressed by the Eleventh Circuit. Thus, there was no Corps decision made in response to instructions from the Eleventh Circuit, and it was not apparent, as it is here, that the Eleventh Circuit has greater familiarity with the issues.

17

Supp. 2d at 245 (quoting Oil, Chem. & Atomic Workers Local Union No. 6–418, 694 F.2d at 1300); accord Reiffin, 104 F. Supp. 2d at 55; Wyandotte Nation v. Salazar, 825 F. Supp. 2d 261, 267 (D.D.C. 2011) (finding transfer warranted because "the Tenth Circuit, and the District of Kansas, in particular, have specialized knowledge of both the parties, their history of litigation, and the statute at issue in the present litigation"); see also Alaska Wilderness League, 99 F. Supp. 3d at 117 (transfer warranted when transferee court had "significant (and recent) experience" with the disputed subject matter). It is beyond question that the Eleventh Circuit's familiarity with the issues and parties involved in this controversy is paramount. Aspects of this controversy have been litigated before the Eleventh Circuit on numerous occasions.[8] The Eleventh Circuit authored a landmark decision on water rights in the ACF Basin, which contained lengthy discussion of a number of the issues relevant here. See Tri-State Water Rights Litig., 644 F.3d at 1192–1205. And the challenged Corps' decision springs from that Eleventh Circuit decision.

Alabama's attempts to distance this suit from the Eleventh Circuit are unconvincing. Alabama first contends that "it is not challenging final agency action the Corps took at the direction of the Eleventh Circuit" because "the Eleventh Circuit's oversight ended in 2012," and the final agency action challenged here occurred in 2017. Pl.'s Opp'n at 30. But the very FEIS that Alabama challenges repeatedly acknowledges its connection to the Eleventh Circuit decision and the Corps' Stockdale Memorandum.[9] Thus, even though the Eleventh Circuit's jurisdiction ended in 2012, this is in many ways a continuation of that litigation.

---

[8] See Georgia v. U.S. Army Corps of Eng'rs, No. 02-10135 (11th Cir.); Alabama v. U.S. Army Corps of Eng'rs, Nos. 03-16424, 05-11123 (11th Cir.); Georgia v. U.S. Army Corps of Eng'rs, No. 04-14864 (11th Cir.); Florida v. U.S. Army Corps of Eng'rs, No. 06-14211 (11th Cir.); In re Tri-State Water Rights Litig., Nos. 09-14657, 09-14810, 09-14811 (11th Cir.); In re Tri-State Water Rights Litig., Nos. 10-14403, 10-14511 (11th Cir.).

[9] See, e.g., FEIS, Vol. 1 at 1-10 ("As a result of the June 2011 ruling, [the Corps] revised the scope of the EIS and Master Manual updates . . . ."); id. at ES-6 ("[The Corps] revised the scope of the EIS and Master WCM update to include consideration of the following: operations that are within its existing authority under the RHA of 1946, taking into account the 2011 11th Circuit Court of Appeals opinion and [the Stockbridge Memorandum] . . . ."); see also id. at 1-5.

Alabama also suggests that the Eleventh Circuit could not possibly have greater familiarity with these issues because it "did not address, and indeed could not possibly have foreseen the various claims" that Alabama asserts here. Pl.'s Opp'n at 31. But that is simply wrong. The Eleventh Circuit directed the Corps to reconsider its discretionary authority under the WSA to grant Georgia's request and provided detailed instructions for the Corps to follow that touch on a number of legal questions involved in this case—including, for example, what constitutes an "authorized purpose" and how to determine what constitutes a "major operational change" under the WSA. See Tri-State Water Rights Litig., 644 F.3d at 1192–1205. These issues are central to Alabama's claims. See Compl. ¶¶ 78–86; 87–94; 104–105.

Finally, the remaining public-interest factor, the relative congestion of the courts' dockets, is neutral. "This factor is weighed by comparing the districts' median times from filing to disposition or trial." Taylor v. Shinseki, 13 F. Supp. 3d 81, 91 (D.D.C. 2014). On average, courts in this district and in the Northern District of Georgia resolve cases in a similar amount of time (6.7 months in the District of Columbia; 6.2 months in the Northern District of Georgia).[10] "Absent a showing that either court's docket is substantially more congested than the other, this factor weighs neither for nor against transfer." Pres. Soc. of Charleston, 893 F. Supp. 2d at 57 (internal quotation marks omitted). Moreover, given that this case is in the very early stages, the transfer request raises no other concerns with judicial efficiency. Id.

In sum, the full public-interest calculation yields two factors that strongly favor transfer, and two that are neutral.

---

[10] Courts in the Southern District of Alabama, however, are on average slower to resolve civil cases (9.5 months). See U.S. Courts, Federal Case Management Statistics, http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2017.pdf. Thus, this factor weighs slightly against transfer to that district.

19

### III. WHETHER TO TRANSFER TO THE N.D. GEORGIA OR THE S.D. ALABAMA

Having determined that, on balance, the private- and public-interest factors favor transfer, the question remains whether to transfer this case to the Northern District of Georgia or to the Southern District of Alabama. Although the effects of the decision will be felt throughout the ACF Basin, it appears, based on the record before the Court, that they will most acutely be felt in the Northern District of Georgia. The claim arose in both transferee districts, but the relative congestion factor also slightly favors the Northern District of Georgia over the Southern District of Alabama. Hence, the Court concludes that the interests of justice are best served by transferring the case to the Northern District of Georgia.

### **CONCLUSION**

For the foregoing reasons, the Court will grant defendants' motion to transfer this case to the Northern District of Georgia. A separate Order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 29, 2018